FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

03 APR 17 AM 9: 36

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JENNIFER LAMBERT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-0623-E |
| | ) | |
| TYSON FOODS, INC., | ) | |
| | ) | **ENTERED** |
| Defendant. | ) | APR 17 2003 |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant Tyson Foods, Inc.'s ("Tyson") Motion

for Summary Judgment, filed on January 17, 2003.

**FACTS AND PROCEDURAL HISTORY**

Plaintiff Jennifer Lambert Smith ("Smith") was employed by Tyson on April 14, 2000 as

a driver trainee in Tyson's Long Haul Division in Oxford, Alabama. *See* Pretrial Agreed

Summary at ¶ 6(a). Smith was initially assigned to Lydia Holmes, a female driver trainer, and

then to Mary Mangels. *Id.* Smith took a medical leave of absence from Tyson which interrupted

her training. *Id.* Upon her return, Smith was assigned to Linda Whitfield. *Id.* Smith was

ultimately assigned to Chris Whatley ("Whatley") on June 6, 2000, and trained with him until

she completed her training on June 16, 2000. *Id. See also* Pl. Ex. 2; Def. Ex. 1 at 35-36; Def.

Ex. 3 at 116. The dispute in this case surrounds what happened while Smith was training with

Whatley.

**I. The Dispute**

Smith contends that Tyson asked her to train with Whatley because it had no available

female trainers. *See* Pl. Reply Ex. 3 at 33. Smith asked Mike Bolen ("Bolen") and Chris Sparks

40

("Sparks") to be reassigned to a female trainer, but that request was denied. *Id.* Bolen and

Sparks told Smith that Whatley had trained other female drivers and that he could be trusted. *Id.*

at 192-93. Smith asserts that she would have been terminated if she had not accepted training

with Whatley. *See* Pl. Ex. 4 at 193. Tyson notes that Whatley was the most senior driver trainer

available at the time, and Tyson had never received any complaint of sexual harassment against

him. *See* Def. Ex. 4 at ¶ 7; Def. Ex. 2 at 174.[1] Tyson also asserts that Smith agreed to the

assignment. *See* Def. Ex. 4 at ¶ 8. During this training period, Smith and Whatley were

traveling on the road, which required them to sleep in bunks in the rear of the truck cab. *See* Pl.

Ex. 4 at 206-07.

Smith asserts that Whatley created a sexually hostile atmosphere while she was training

with him. First, Whatley told Smith that he would not stop for her to use the bathroom and for

her to use a cup. *See* Pl. Ex. 175-77, 209-10. Whatley told her that if she could not aim, he

would hold the cup for her. *Id.* Smith attempted to urinate in the cup, but she wet a newspaper

which made Whatley upset. *Id.* Terry Quast testified that Whatley told him that he was angry

because Smith kept having to go to the bathroom when there was no place to stop. *See* Pl. Ex. 7

ay 168. Tyson notes that during the "cup" incident, there were no accessible restroom facilities.

*See* Def. Ex. 3 at 242, 243, 245. According to Tyson, Whatley told Smith that she would have to

wait until the next rest area. *Id.* at 243. Smith herself chose to urinate in the cup, and urine

splashed in the sleeping compartment and on Whatley's newspaper. *Id.* Whatley became

irritated, and stated that, if Smith wanted, he would put on gloves, close his eyes, and hold the

---

[1]Tyson also notes that Bolen spoke with Smith's father, Brad Lambert, a Tyson driver, and her grandfather, Doyle Lambert, a retired Tyson driver, about Smith riding with Whatley. *See* Def. Ex. 4 at ¶ 7. Brad Lambert stated that neither he nor Doyle Lambert had any objection to the assignment. *See* Def. Ex. 6 at ¶¶ 6, 8.

cup to prevent splashing. *Id.*

Next, Whatley grabbed Smith's breasts while driving down the road. *See* Pl. Ex. 3 at 209-10; Pl. Ex. 4 at 279-80. Again, Tyson offers a different explanation for the incident. Tyson asserts that Whatley accidently brushed Smith's breast on one occasion because of a sudden stop in traffic. *See* Pl. Ex. 4 at 279-80. Tyson asserts that this is what Smith reported to Sauer. *See* Def. Ex. 7 at ¶ 4. Smith counters that Whatley intentionally swerved the truck and grabbed her breasts. *See* Pl. Reply Ex. 3 at 212. Smith also asserts that Whatley told her that it was hard for him to drive with her breasts bouncing. *See* Pl. Ex. 3 at 178, 209. Tyson denies that Whatley made such a statement.

Finally, Smith points to a number of statements that Whatley allegedly made. According to Smith, Whatley stated on more than one occasion that he slept naked and asked Smith to sleep naked also. *See* Pl. Ex. 3 at 113, 115, 172-75, 209. Also, Whatley told Smith that he had viagra and that he would take it if Smith wanted him to. *See* Pl. Ex. 3 at 113, 115, 172-75, 209, 402. Whatley on more than one occasion asked Smith to leave her husband and run team with him. *See* Pl. Ex. 3 at 112, 113-14, 117, 209, 401. Lastly, while they were stopped a truck stop to take showers, Whatley told Smith that he would wash her with his hands since the truck stop was out of wash cloths. *See* Pl. Ex. 3 at 195-96, 209. Tyson denies that Whatley made any of these statements.

Whatley certified Smith to drive solo at the conclusion of her driver training. *See* Def. Ex. 1 at 36; Def. Ex. 4 at ¶ 8. Smith did not complain about Whatley's behavior during her training period with him. She asserts that she did not complain because Whatley had told her that if she did not do everything he said, he would put her on a bus back to Alabama and that she

3

would not work for Tyson. *See* Pl. Reply Ex. 3 at 314-16. Tyson contends that Whatley stated that if Smith did not follow safe driving practices, she could be sent back to Alabama. *See* Def. Ex. 3 at 202-03. Smith also believed that, since Whatley had made comments about sleeping naked to Brandon Pierce and no action had been taken, she would be terminated if she complained to Tyson. *See* Pl. Reply Ex. 3 at 314. Tyson denies that Whatley ever made such a statement to Brandon Pierce.

Smith finally did complain about Whatley's conduct on August 22, 2000, to Sparks, the Terminal Manager. *See* Pl. Ex. 6 at 123.[2] Sparks requested that Smith provide a written statement. *Id.* According to Tyson, Sparks asked for the statement to ensure he knew exactly what Smith was alleging. *See* Def. Ex. 2 at 124. Smith testified that Sparks was both sympathetic and responsive to her complaints. *See* Def. Ex. 1 at 159, 170. Sparks informed Whatley that Smith had filed a complaint against him, and Sparks stated that Whatley became mad. *Id.* at 128-29. Whatley denied that the alleged events took place. *See* Def. Ex. 2 at 128, 141, Depo. Ex. 3. Sparks later informed Whatley that Smith had filed a formal complaint, advised Whatley of the seriousness of the complaint, and told Whatley to stay away from Smith. *See* Pl. Ex. 4 at 308; Def. Ex. 2 at 141.[3] Sparks testified that he then called Ken Sauer ("Sauer") and Terry Quast ("Quast") and informed them of Smith's complaint. *See* Pl. Ex. 6 at 132. Sparks was told that Quast would be in charge of handling the investigation. *Id.* at 134. Sparks did not interview any of the witnesses named in Smith's complaint or conduct an investigation.

---

[2]Interestingly, Smith's own father, who is employed by the defendant, testified that Smith never complained to him of any conduct of Whatley.

[3]Smith points to Whatley's deposition testimony, in which he states that Sparks did not ask him any questions or tell him what Smith had alleged. *See* Pl. Reply Ex. 4 at 306-08, 319-21.

*Id.* at 133, 141. Sparks did transfer Smith to the fleet dispatched by Wayne Gaines, away from Whatley. *See* Def. Ex. 1 at 41-42.

Approximately two weeks after filing her August 22, 2000 complaint, Smith was informed that she needed to meet with Sauer to discuss the complaint. *See* Pl. Ex. 3 at 144. Smith asserts that she provided a written statement to Sauer, although Tyson denies that a written statement was given. Smith asserts that during this meeting, Sauer informed Smith that he had spoken to Whatley and that Whatley was very upset. Sauer also stated that he could not guarantee what Whatley would do if he ran into Smith. *See* Pl. Ex. 3 at 144-45. Tyson denies that Sauer ever made these statements.

Smith asserts that after she spoke with Sauer, she was in fear of running into Whatley and what he might do to her, even though she had been transferred. *See* Pl. Reply Exhibit 3 at 170, 235-36. She then filed her EEOC charge. *See* Pl. Ex. 3 at 144-45. Tyson asserts that by the time Smith spoke with Sauer, she had been transferred to Wayne Gaines' fleet and had no further contact with Whatley. Tyson also asserts that Sauer told Smith that he would talk to Whatley, and for her to call him if she ever had any problems in the future. *See* Def. Ex. 7 at ¶ 5, Aff. Ex. A. Smith denies that Sauer made these statements. Sauer met with Whatley shortly thereafter. *See* Def. Ex. 7 at ¶ 6. Although Whatley denied the allegations, Sauer also counseled Whatley about Tyson's policies, emphasized the seriousness of Smith's complaints, and told Whatley to stay away from Smith. *Id.*[4]

Quast testified that Sparks and Saucer handled the entire internal investigation of Smith's charge. *See* Pl. Ex. 7 at 29-30. Tyson denies this charge. Sparks testified that the Terminal

---

[4]Again, Smith cites deposition testimony to the contrary. *See* Pl. Reply Ex. 4 at 345-47.

Manager handled EEO complaints. He further testified that he had not been given any special training on how to investigate or handle EEO claims. *See* Pl. Ex. 6 at 31. Sparks did testify that he received training on at least an annual basis on Tyson's policies against sexual harassment. *See* Def. Ex. 2 at 93, 97, 103.

Quast testified that he conducted the EEOC investigation regarding Smith's charge. *See* Pl. Ex. 7 at 29-30. Quast admitted that he did not address all of the allegations in Smith's EEOC charge with Whatley when they met on or around December 21, 2000, only those that he thought were pertinent. *Id.* at 166-72. Quast testified that Whatley stated that he was upset when Smith urinated on the newspaper in the truck, *id.* at 140-41, and that Whatley got angry that Smith kept asking to stop and go to the restroom. *Id.* at 168. Quast observed in a written summary of his meeting with Whatley that Whatley became "aggressive" when asked direct questions about Smith's complaint. *Id.* at 139. Tyson denies that Whatley ever acted aggressively toward anyone. Quast also testified that Mary Mangels told him that Smith had told her that Whatley was obnoxious and had made comments about getting into the sleeper with her. *See* Pl. Ex. 8. Tyson asserts that Mary Mangels also told Quast that she did not believe Smith.[5] Quast testified that his investigation did not show any information to substantiate Smith's claim. *See* Pl. Ex. 7 at 186-87.

Smith's EEOC charge was filed on October 27, 2000. Smith alleges that after her charge was filed, she began to be retaliated against by Tyson. Smith alleges that she began to encounter significant mechanical difficulties with her truck. *See* Pl. Ex. 3 at 73. Smith also alleges that

---

[5]Quast's notes from his talk with Mary Mangels do state that Smith's complaint may be a way to get back at Whatley. *See* Pl. Ex. 8. It is unclear whether Mangels told Quast this, or whether this was Quast's personal observation.

Tyson failed and/or refused to adequately repair her vehicle, precluding her from completing her scheduled deliveries. *Id.* at 68-70, 73. Smith contends that, during this same period, various items were periodically stolen from her locked truck, despite no evidence of forced entry. *Id.* at 131-32. Tyson counters that all drivers have occasional mechanical problems with trucks, which are assigned based on years of service with Tyson. *See* Def. Ex. 4 at ¶ 12. Tyson also notes that as a relatively new driver, Smith had a relatively old truck. Moreover, Smith admitted that she has no evidence that she suffered more problems than other drivers, that her problems were handled differently, or that Tyson stole anything from her truck. *See* Pl. Ex. 1 at 133-34, 152-53, 228.

Smith also alleges retaliatory acts with regards to her routes. Smith alleges that she made repeated requests to have her route modified in an attempt to avoid Whatley. However, she was told that her routes would not be modified unless or until she dropped or settled her charges. *See* Pl. Ex. 3 at 143. Tyson counters by noting that Smith stated that Sparks "handled [the complaint] well, you know. Whatley - he moved me to Wayne's board, and I believe Wayne made sure that we didn't run together." *See* Def. Ex. 1 at 170. Smith also testified that she had no more problems with Whatley. *Id.* at 234-35. She also alleges that her route was changed on one occasion so that she would miss a meeting with a lawyer. *See* Pl. Ex. 3 at 82. Finally, she asserts that she was continually denied requests for route changes that she was entitled to, including one incident when she requested to return to Alabama because she was ill. *See* Pl. Ex. 2 at ¶ 17. Tyson denies that these events occurred.

Lastly, Smith asserts that she began to encounter significant and consistent problems concerning her pay and compensation from Tyson. She alleges that she was denied and/or

7

delayed compensation despite timely submission of expenses. *See* Pl. Ex. 2 at ¶ 15; Pl. Ex. 3 at 91. Smith also alleges that she was denied compensation and/or reimbursement for her driver training. *See* Pl. Ex. 2 at ¶ 15. Tyson notes that Smith admitted that the compensation issues were resolved, and that she had no evidence that she was treated differently than any similarly situated employees. *See* Def. Ex. 1 at 156-58, 231-32.

## II. Tyson's Sexual Harassment Policy

At all relevant times, Tyson had a written policy against sexual harassment and other forms of discrimination in the workplace. *See* Def. Ex. 2 at 98, Depo. Ex. 9 at Bates Stamp 175. During Tyson's driver orientation process, all new hires are given a copy of Tyson's written policy, which includes complaint procedures, and shown a video which elaborates on the policy. *See* Def. Ex. 2 at 103-07, Depo. Ex. 9 at Bates Stamp 175, 184, 187-88. However, Sparks did testify that he "was not sure that the exact policy is distributed to everyone or not." *See* Pl. Reply Ex. 1 at 100. Sparks testified that employees would have knowledge of the policy through watching the video. *Id.* Tyson asserts that the Oxford, Alabama Terminal also conducts sexual harassment training on at least an annual basis. *See* Def. Ex. 7 at 93-97. Smith counters that Sparks testified that fleet managers, officer personnel, and payroll coordinators receive this yearly training. *See* Pl. Reply Ex. 1 at 94. Tyson also contends that drivers also receive training during safety meetings. *See* Def. Ex. 7 at 103. Smith admits that she went to safety meetings, but denies that she received "additional" training there. Rather, the same video is shown once a year. *See* Pl. Reply Ex. 1 at 103.

According to Tyson, Smith was given a copy of Tyson's sexual harassment policy and was required to watch the video. *See* Def. Ex. 1; Ex. 2, Depo. Ex. 9 at Bates Stamp 175, 184,

187-88. Smith also attended an annual training meeting where the sexual harassment policy was reviewed. *See* Def. Ex. 2, Depo. Ex. 9 at Bates Stamp 179. In addition, Smith was advised, prior to her driver training, on how to report complaints, including complaints of sexual harassment. *See* Def. Ex. 1 at 213-14; Ex. 2, Depo. Ex. 9 at Bates Stamp 175, 184, 187-88. Smith admits that she has seen the video. However, she denies having received a copy of the policy, instead signing a "company position" memorandum. *See* Pl. Reply Ex. 2. Smith cannot admit or deny whether she attended the annual meeting, and denies that Tyson's evidence demonstrates that she received information prior to her training.

Tyson notes that, although she was familiar with Tyson's sexual harassment procedures, Smith did not report her complaint until August 22, 2000, approximately two months after she completed her training with Whatley. *See* Def. Ex. 1 at 143-44. Tyson also again notes the steps that it took in response to Smith's complaint, i.e., speaking with Whatley, transferring Smith, etc. Smith counters that although she did not file a complaint until August 22, 2000, she did talk to her dispatcher about Whatley's conduct. *See* Pl. Reply Ex. 3 at 212, 223-24. She also informed her dispatcher that she did not want Whatley calling her or coming around her. *Id.* at 33, 158; Def. Ex. 7 at ¶ 4.

**III. Smith's Termination**

On or around February 28, 2001, Smith was terminated by Tyson, which she alleges was because of her charges against Whatley. Tyson contends that Smith was terminated for poor performance, specifically, for repeatedly failing to meet delivery deadlines. Smith admitted that she has been late on multiple occasions. *See* Def. Ex. 43-44. Smith was late for a delivery on or around October 31, 2000 because she overslept. *See* Def. Ex. 5 at ¶ 5. She was given a

9

documented verbal warning for this incident. *Id.* at Aff. Ex. A. Smith does not admit or deny that she received the verbal warning, and notes that the document is not signed by the supervisor or a witness. On December 12, 2000, Smith was again late for a delivery because she stopped to sleep en route to her destination, without any effort to communicate with dispatch concerning her status. *See* Def. Ex. 6 at ¶ 6, Aff. Ex. B. Smith was given a written counseling statement for this violation, which advised her of the importance of making her delivery on time, and Tyson's expectation that she will let someone know if she will be late. *Id.* The statement also warned Smith that another violation within a six month period would result in suspension or termination. *Id.* Smith notes that she did not sign the statement. *See* Pl. Reply Ex. 3 at 239-40. She also denies being told about the six-month "probation." Smith did admit that she was aware of her duties to report any tardiness. *See* Def. Ex. 1 at 239.

On or around February 19, 2001, Smith was again late in delivering two separate loads. *See* Def. Ex. 5 at ¶ 7, Aff. Ex. C. Smith admits she was late, but contends that she called Tyson on February 18, 2001 to report being ill. *See* Pl. Reply Ex. 3 at 366-67. Smith was given a second counseling statement. *Id.*[6] On or around February 20, 2001, Smith wholly failed to pick up her scheduled load, and drove without a load from Florida to Oxford, Alabama. *See* Def. Ex. 5 at ¶ 8, Aff. Ex. D. Smith failed to contact dispatch until after she arrived back at the terminal. *Id.* Smith contends that she was en route from Florida to pick up her assigned load in Georgia when her route was changed. She called Tyson in the afternoon and informed them that she could not pick up the load. *See* Pl. Reply Ex. 3 at 244-45. She also contacted Tyson when she arrived at the Oxford, Alabama yard. *Id.* at 246; Pl. Reply Ex. 5. She called Wayne Gaines the

---

[6]Smith denies that this was her second counseling statement.

next morning. *See* Pl. Reply Ex. 3 at 246. On February 21, 2001, Smith was suspended until February 28, 2001, pending an investigation. *Id.*[7] Tyson made the decision to terminate Smith, effective March 1, 2001. *See* Def. Ex. 6 at ¶ 9, Aff. Ex. E.

Smith testified that she does not know whether any other drivers were treated more favorably than her in terms of discipline and discharge. *See* Def. Ex. 1 at 140-41.[8] Smith contends that she was treated differently than Walter Klatt, whose corrective actions were signed by a supervisor and by Klatt, demonstrating that he had knowledge of the actions being taken against him. *See* Def. Ex. 5 at ¶ 10.

Smith filed this complaint on March 8, 2002. The complaint, brought under Title VII, 42 U.S.C. § 2000e *et seq.*, alleges gender discrimination/sexual harassment (Count I), and retaliation (Count II). Tyson now seeks summary judgment on both counts.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)

---

[7]Smith contends that she was given the last two "write ups" on the same day, February 21, 2001.

[8]Tyson also notes the opinion of Smith's father, who stated that Smith may have actually been treated better than other employees because of her family's history with Tyson. *See* Def. Ex. 6 at ¶ 10.

11

(quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'"  *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.  *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery.  *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party."  *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Sexual Harassment Claim

#### A. Defendant's Position

Tyson notes that in order to establish a claim of sexual harassment under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature, (3) the harassing conduct was based on her sex, (4) the harassment was sufficiently severe or

12

pervasive to alter the terms and conditions of employment, and (5) a basis exists for holding the employer liable. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000). Tyson also notes that "the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met." *Id.* at 583. In other words, "[i]nnocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." *Id.*

Here, Tyson argues, some of the alleged conduct was not "sex based," and therefore should not be counted in the court's analysis. Tyson contends that Smith must demonstrate that "but for the fact of her sex, she would not have been the object of harassment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 n.5 (11th Cir. 1999)(citations omitted). Tyson contends that Whatley's offer to hold a cup while Smith urinated was not sex-based conduct. Similarly, Tyson argues, Whatley's alleged request that Smith run team with him is simply too attenuated and ambiguous to merit consideration under *Gupta*. While acknowledging that the breast grabbing issue is a closer case, Tyson argues that it should not be considered given the circumstances under which it occurred.

Tyson also argues that the alleged conduct was not sufficiently severe or pervasive under current Eleventh Circuit precedent. Tyson notes that the severe or pervasive requirement "tests the mettle of most sexual harassment claims." *Gupta*, 212 F.3d at 583. In *Gupta*, the Eleventh Circuit reasoned that

> Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L. Ed.2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace--such as male- on-male horseplay or intersexual flirtation--for discriminatory 'conditions

13

of employment.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed.2d 201 (1998).

*Id.* at 583.

Tyson also notes that the severe or pervasive requirement includes both a subjective and objective component. *Mendoza*, 195 F.3d at 1246. With respect to the objective standard, four factors are generally considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Tyson argues that Smith's terms and conditions of employment were not affected, because she successfully completed her training under Whatley and he certified her to drive solo. Tyson contends that, under an objective standard, Smith's claims must fail.[9]

Finally, Tyson argues that it is entitled to a complete affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). According to Tyson, an employer is not liable for a hostile work environment if it proves that (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765. Tyson argues that it can meet this first element "by promulgating an anti-harassment policy." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000). Tyson contends that it is undisputed that it had a widely disseminated

---

[9]Tyson argues that the facts of this case are similar to those in *Mendoza* and other cases where no violation was found. *See* Def. Br. at 24-25.

policy that included complaint procedures. Tyson also notes that it had showed all employees a video that reinforced the anti-harassment policies. Tyson asserts that this video was shown to employees at orientation and on an annual basis. Tyson notes that after Smith filed her complaint, both Sparks and Sauer interviewed Whatley, and Smith was transferred away from Whatley. According to Tyson, Smith herself testified that the steps taken by Tyson were effective.

Tyson also argues that the second element of the *Faragher/Ellerth* defense has been met. Tyson notes that "'the law against sexual harassment is not self-enforcing' and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Parkins v. Civil Constructors of Illinois*, 163 F.3d 1027, 1038 (7th Cir. 1998) (citation omitted). Therefore, "[w]hen an employer has taken steps, such as promulgating a considered sexual harassment policy, to prevent sexual harassment in the workplace, an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999). Here, Tyson notes, Smith admitted that she was familiar with Tyson's anti-harassment policies. She admitted that she watched the training video. Nevertheless, she waited two months before filing her complaint. Tyson argues that this is unreasonable as a matter of law. *See Faragher*, 524 U.S. at 807-08 ("[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.").

15

B.  Plaintiff's Response

Smith argues that all of the alleged incidents were in fact sex-based.  With regards to the incident involving Smith's urinating in a cup, she argues that the humiliating and sexual nature of the conduct is undeniable.  Smith notes that she would have had to expose her genitalia to Whatley in order for him to hold the cup for her.  Moreover, Smith argues, the fact of urinating in the cup at all, even when she held it, was embarrassing and degrading.  *See Dees v. Johnson Controls World Servs, Inc.*, 168 F.3d 417, 419 (11th Cir. 1999) (noting that on "one particularly humiliating occasion," employee picked plaintiff up and squeezed her so hard that she urinated in her pants).  As for Whatley's comments about running team with him, Smith notes that she was married at the time, and that Whatley was essentially asking her to leave her husband to team up with him.  Clearly, Smith contends, these comments were sex-based.  Smith also notes Whatley's conflicting stories regarding the "inadvertent" breast touching incident.  *Compare* Pl. Ex. 4 at 279-80 (stating that Whatley was driving and Smith fell forward) *with* Pl. Ex. 5 (stating that Smith was driving and Whatley fell forward.  Thus, Smith argues, Whatley's "innocent" explanation has little value.

Smith also argues that Whatley's conduct was both subjectively and objectively severe and pervasive.  Smith argues that since she complained to numerous individuals within the Tyson organization about Whatley's conduct, it is clear that the conduct was subjectively offensive.  As for the objective prong, Smith acknowledges the factors cited by Tyson, but also notes that the conduct must be viewed in the overall context rather than as isolated acts.  *Mendoza*, 195 F.3d at 1246.  Smith argues that her circumstances were extreme.  She was being trained by Whatley while on the road.  She was isolated and confined to Whatley's presence day

16

and night.  She had to sleep in the same sleeping compartment with Whatley.  Smith argues that under these circumstances, using the factors articulated in *Mendoza*, the conduct that she was exposed to was objectively severe and pervasive.  *See* Pl. Reply Br. at 21-23.  At the very least, she argues, there is a question of fact on the issue.

Smith also argues that Tyson is not entitled to the *Faragher/Ellerth* affirmative defense.  First, Smith contends, an employer is vicariously liable for sexual harassment committed by a supervisor when it results in a tangible employment action such as termination or unwanted resignation.  *See Dees*, 168 F.3d at 422.  Smith contends that her termination was the direct result of her complaints about Whatley's conduct.  Thus, since she suffered a tangible employment action, Smith argues that the *Faragher/Ellerth* defense is not available to Tyson.  Smith also asserts that Tyson does not qualify for the defense, even assuming that she suffered no tangible employment action.  As for the first prong, Smith notes that Sparks testified that he was "not sure that the exact policy is distributed to everyone or not."  *See* Pl. Reply Ex. 1 at 100.  Moreover, Smith notes, it was Tyson that assigned her to Whatley in the first place, even though it knew that this would require them sleeping in the same sleeper cab together.

Smith also argues that Tyson did not take steps to remedy the situation.  Smith contends that she complained to Brandon Pierce about her problems with Whatley on June 20, 2000.  *See* Pl. Ex. 2 at ¶ 8.[10]  However, no action was ever taken by Pierce, and no action was taken until she complained to Sparks on August 22, 2000.  Smith also notes Whatley's deposition testimony, in which he stated that Sparks did not go into much detail with him about Smith's complaint.  Smith points out that Sparks testified that he did not interview any witnesses or investigate the

---

[10]The court notes that this was at the end of the alleged period of harassment.

17

complaint.  Smith also points out that there was conflicting testimony over who exactly was in charge of the investigation into Smith's complaint.  *Compare* Pl. Ex. 6 at 133, 141, *with* Pl. Ex. 7 at 30.  Finally, she notes that Sauer told her that he could not promise what Whatley would do if he saw her somewhere at a truck stop.

As to the second prong of the affirmative defense, Smith points to the context in which she endured the harassment.  Smith was on the road with Whatley and confined to his presence at all times.  Whatley had told Smith if she did not do exactly what he said, she would be sent back to Alabama and would not work for Tyson.  Smith argues that, under the totality of the circumstances, she had no other choice but to rebuff the sexual advances of Whatley.  As soon as her training was over, Smith contends, she complained to Brandon Pierce, and then later to Sparks.

## II. Retaliation Claim

### A. Defendant's Position

Tyson notes that in order to establish a *prima facie* case of retaliation, Smith must show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action, and (3) that there was some causal relationship between the two.  *See Holifield v. Reno*, 115 F.3d 1555, 1556 (11th Cir. 1997).  Tyson does not dispute that Smith's complaint and EEOC charge constitute protected activity.  Rather, Tyson argues that, with the exception of her termination, nothing she complains of constitutes an adverse employment action.  Tyson notes the case *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001), in which the Eleventh Circuit stated that

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms,

18

conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

. . . .

. . . Title VII is not designed to make federal courts "'sit as a super-personnel department that reexamines an entity's business decisions.'" Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. The same concern exists for public entities such as the Town's Police Department, which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public.

For these reasons, applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks. Courts elsewhere have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm.

*Id.* at 1239, 1244 (emphasis in original) (citations omitted). According to Tyson, Smith is asserting that she was retaliated against in that she began to experience problems with her truck, problems with her paychecks, and problems with her routes. However, Tyson contends, Smith admitted that she had no evidence that anyone at Tyson caused the problems with her truck, and she admitted that the paycheck problems were resolved. As for the route problems, Tyson notes that she received the same pay regardless of which route she drove. Tyson also argues that the reason Smith did not receive the time off she requested was because she did not follow the proper procedure for requesting a leave of absence. Tyson notes that the one time that she did

19

comply with Tyson's procedures (May 2000), she was given the leave she requested. Smith also testified that she knew of no other drivers who were allowed to have time off without following the proper procedures.

Tyson acknowledges that termination is an adverse employment action. However, Tyson argues, Smith has failed to show a causal connection between her complaint/EEOC charge and her termination. Tyson cites *Clark County School District v. Breeden*, 532 U.S. 268 (2001), in which the Supreme Court that "mere temporal proximity between the defendant's knowledge of the protected activity and an adverse employment action must be 'very close' to establish causation." *Id.* at 273-74 (citation omitted). According to Tyson, the Court in *Breeden* cited with approval cases finding that a three or four month lapse would break the causal chain. Here, Smith was terminated six months after her initial complaint and four months after her EEOC charge was filed. Tyson argues that these time periods are insufficient to establish a causal relationship under *Breeden*.

Moreover, even assuming that Smith had proven her *prima facie* case, Tyson argues, it has articulated a legitimate, nondiscriminatory reason. Specifically, she was terminated because of her repeated tardiness. Tyson argues that the only evidence of pretext might be that she had been late but not disciplined while under the supervision of Brandon Pierce. However, once Smith requested a transfer and was transferred to Wayne Gaines, Tyson argues, she was consistently disciplined for being late. According to Tyson, this is not evidence of pretext, but rather evidence that Pierce is more lenient than Gaines. More importantly, Tyson contends, Smith has identified no other drivers under Gaines' supervision that were treated differently than

20

her.[11]

### B. Plaintiff's Response

Smith notes that in order to recover for retaliation under Title VII, the plaintiff need not prove the underlying claim of discrimination that led to her protest, but rather must show that she had a reasonable good faith belief that the discrimination existed. *See Meeks v. Computers Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Smith also notes that an adverse employment action is an "ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Gupta*, 212 F.3d at 587 (citation omitted). Smith then restates the facts that she alleges show that she was retaliated against, i.e., the problems with her truck, the problems with her routes, the problems with her compensation, and her ultimate termination. Smith argues that these events, in their totality, meet the "threshold level of substantiality . . . to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

Smith also shows that there was a causal relationship between her complaints and the adverse employment actions that she suffered. Smith notes that in order to show a causal relationship, a plaintiff must show that "the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999). Smith argues that her problems

---

[11]Tyson also argues that to the extent that Smith's claim can be construed as a disparate impact claim, it too must fail. Smith has offered no evidence as to any comparators, which Tyson argues is required in order to sustain a claim. *See, e.g., Rojas v. Florida*, 285 F.3d 1339 (11th Cir. 2002); *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999).

began immediately after her complaint to Sparks on August 22, 2000, and culminated in her termination on March 1, 2001. Smith argues that this close temporal proximately creates an issue of fact with regard to the causal relationship. Smith also argues that the reasons given by Tyson for her problems and termination were pretextual. Smith contends that Tyson has failed to explain why her truck continually had problems, why her routes were changes, etc. Smith also contends there is a factual dispute as to her last "late" delivery that resulted in her termination.

**CONCLUSIONS OF THE COURT**

Apparently, the plaintiff purports to make the following claims:

(1) A sexual harassment claim arising out of her time spent with Whatley.

(2) A retaliation claim based on her termination after filing an EEOC charge.[12]

### I. Sexual Harassment

The court starts with the assumption that the plaintiff has offered sufficient evidence to establish that she was subject to unwelcome sexual harassment based on her sex which was severe and pervasive for at least some portion of a ten day period while she was with Whatley. What is not clear is: (1) that Whatley was her "supervisor" during this period; (2) that, if Whatley was her supervisor, there was any tangible action associated with the alleged harassment; or (3) that, if there was tangible action and Whatley was a supervisor, plaintiff has rebutted defendant's *Faragher* affirmative defense.

_____

[12]Plaintiff also makes some conclusory allegations of retaliation with regard to some mechanical difficulties she experienced with her truck and some items being stolen from her truck. It is not clear from her last brief whether plaintiff attempts to maintain a separate retaliation claim based on this conduct. In any event, she has not established any substantial evidence of retaliation with regard thereto. It has not been attributed to any person or persons with authority or with knowledge of the EEOC charge, nor has she otherwise offered proof of any causal relationship.

22

This court first concludes that there is no substantial evidence that Whatley was plaintiff's "supervisor." The court is not aware of any Supreme Court or circuit court of appeals cases which would suggest that he was. In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), the court, at least tangentially, discussed what is intended by the term "supervisor" in a sexual harassment analysis under *Faragher* and *Ellerth*.[13] The court stated:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) <u>cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor</u>. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes.
>
> For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.

*Id.* at 761-63 (citations omitted) (emphasis added).

The court equated the power and authority to take tangible action with "supervisory" status. The court stated: "[A] tangible employment action constitutes a significant change in

---

[13]There was no question in *Faragher* that the alleged culprits were the plaintiff's supervisors.

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits . . . ." *Id.* at 761.

In *Mikels v. City of Durham,* 183 F.3d 323, 333-334 (4th Cir. 1999), the court stated:

> The most powerful indicator of such a threat-induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in the particular situation, to take tangible employment actions against the victim, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See Ellerth,* 118 S. Ct. at 2268-69 (so defining this level of authority as necessarily derived from the agency relation); *Faragher,* 118 S. Ct. at 2293 (imposing aided-by-agency vicarious liability where no tangible employment action taken but one of two harassing supervisors had authority to hire and fire, both had "virtually unchecked authority"over subordinates, "directly controlling and supervising all aspects of [the victim's] day-to-day activities," and victim and colleagues were "completely isolated from the [employer's] higher management").

In *Hall v. Bodine Elec. Co.*, 276 F.3d 345 (7th Cir. 2002), the court stated:

> An employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee. *Parkins,* 163 F.3d at 1032. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). In *Parkins,* we held
>
> > it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.
>
> *Id.* at 1034.

*Hall,* 276 F.3d at 355-56. The court added that the fact that a person was charged with training the

plaintiff and other less experienced employees did not make him a supervisor. The court stated:

> Moreover, the fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII

supervisory relationship. An individual is not a supervisor unless he possesses the authority to directly affect the terms and conditions of a victim's employment. *See, e.g., Haugerud v. Amery School Dist.,* 259 F.3d 678, 696-97 (7th Cir. 2001) (employer may only be held vicariously liable for the acts of those who can be considered the employer's proxy-an individual holding a sufficiently high position in the management hierarchy of the company). The type of marginal discretion Lopez had over Hall's work operations is not sufficient to impute Title VII vicariously liability to an employer. *See, e.g., Parkins,* 163 F.3d at 1034. Additionally, Hall's own actions indicate that she never considered Lopez to be her supervisor. Whenever she had a complaint, she spoke with her actual supervisor (i.e., Steve Conn or Brian Kolka) or the human resources department, not with Lopez or anyone else in his capacity.

*Id.* at 356. *See also Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1034 (7th Cir. 1998),

where the court stated that a supervisor is a person with "authority . . . of substantial magnitude,"

Hence, it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer.

*See also Savino v. C.P. Hall Co.,* 199 F.3d 925, 932 (7th Cir. 1999); *Phillips v. Taco Bell Corp.,*

156 F.3d 884, 888 (8th Cir. 1998); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 156 F.3d

581, 592 (5th Cir. 1998).

At least two district court cases in this circuit are consistent with the above-cited

holdings. *See McDaniel v. Fulton County School Dist.,* 233 F. Supp. 2d 1364, 1375 (N.D. Ga.

2002), and *Underwood v. Northport Health Servs., Inc.,* 57 F. Supp. 2d, 1289, 1303-04 (M.D.

Ala. 1999).

This court concludes that there is no substantial evidence that Whatley was the plaintiff's

"supervisor." The evidence is to the contrary.[14]

---

[14] Even if Whatley were considered to be a supervisor, the record substantially suggests that defendant can maintain its affirmative defense. However, this court will not finally decide whether the plaintiff's rather weak evidence to the contrary rebuts the defense.

25

The court further concludes that the plaintiff's argument that Whatley caused the tangible action of her termination is specious. There is no evidence that Whatley caused any tangible negative action with reference to plaintiff's employment. There is no evidence that the alleged harassment was reported to anyone with authority before August 22, 2000. Thereafter, the defendant took prompt remedial action.

While the court assumes that the plaintiff has offered evidence which establishes *prima facie* proof of sexual harassment, that decision is certainly not ironclad correct when the evidence is compared to that in *Mendoza, supra,* and that in the cases from other circuits cited by the majority in *Mendoza.* 195 F.3d at 1246-47, 1249.[15]

Unlike the situation in *Dees v. Johnson Controls World Servs., Inc.,* 168 F.3d 417 (11th Cir. 1999), there is no substantial evidence here that the defendant knew or should have known between June 6 and June 16, 2000, that plaintiff was allegedly being subjected to sexual harassment. Further, in *Dees,* it was "beyond serious doubt that Rainey and Jacobs were Dees' supervisors--the two men had the authority to fire or promote her . . . ." 168 F.3d at 422 n.12 (emphasis added). When the defendant received notice of the alleged harassment, it took prompt remedial action.

## II. Retaliation

The only arguable basis for suggesting that plaintiff's termination was caused by her complaint(s) and/or charge is the argued proximity between defendant's knowledge of the

---

[15]*See also Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir. 1999)("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, *long lasting,* unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.")(emphasis added)(citations omitted). The alleged conduct here lasted ten days at most. However, again, the court does not reach the severity issue.

26

protected conduct and the adverse employment action.  Plaintiff's argument in this regard fails

because of the following statement in *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-

74 (2001):

> The cases that accept mere temporal proximity between an employer's knowledge
> of protected activity and an adverse employment action as sufficient evidence of
> causality to establish a prima facie case uniformly hold that the temporal
> proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248,
> 1253 (CA10 2001).  *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (CA
> 10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168,
> 1174-1175 (CA 7 1992) (4-month period insufficient).  Action taken (as here) 20
> months later suggests, by itself, no causality at all.

The evidence is otherwise overwhelming that plaintiff's termination was caused by her

undisputed tardiness with respect to her trucking activities.  Her own father stated:

> Jennifer Lambert Smith ("Jennifer") is my daughter. . . . I believe that Jennifer
> was [placed] with Linda Whitfield, an over-the-road driver, but that after a while,
> she asked to be removed from Whitfield's truck because the two did not get
> along. . . . I had contact with Jennifer during her training under Mr. Whatley, and
> she did not complain of any problem with him.  My impression was that she was
> happy with her training. . . . Both my father and I have driven for Wayne Gaines
> in the past.  I believe that Gaines is fair with respect to his treatment of drivers,
> whether male or female.  If a driver is late in delivering loads and fails to correct
> the problem after warnings, he or she deserves to be terminated in my opinion.
> Tyson emphasizes the importance of customer service and timeliness of
> deliveries, and the expectation that drivers let dispatch know if the driver is going
> to be late.  I believe that Jennifer may have been given more favorable treatment
> than other drivers, both male and female, because of the fact that I drive for Tyson
> and her grandfather drove for Tyson.  At one point, I did make a comment to
> Wayne Gaines to the effect that if other drivers had the same record as Jennifer in
> terms of late deliveries, that person would no longer have a job. . . .

*See* Def. Ex. 6 at ¶¶ 3-4, 7, 10.  In a First Amendment retaliation situation, the court stated that a

plaintiff cannot "artificially [link] all one's behavior" to protected activity.  *Brochu v. City of

Riviera Beach*, 304 F.3d 1144, 1161 (11th Cir. 2002).[16]

---

[16]Compare the facts of this case with those in *Rogers v. City of Chicago*, 320 F.3d 748 (7th Cir. 2003).

27

**III. Summary**

Whatley was not plaintiff's supervisor and, in any event, he took no action which resulted in a tangible employment injury.  As soon as the defendant knew or should have known of the alleged harassment, it took prompt remedial action to isolate her from Whatley.  The court does not reach the issue of whether the limited time frame of the alleged harassment is significant in determining severity or pervasiveness.  The court also does not reach the issue of whether the alleged conduct affected plaintiff's working conditions.

Some of the purported acts of retaliation were not of the nature to constitute adverse employment actions.  In any event, there is no evidence that they were caused by anyone with notice of the protected conduct or that they were caused by such conduct.  There is not a reasonable inference that the termination was caused by the protected conduct of plaintiff.  The evidence is overwhelming that it was caused by plaintiff's tardiness, etc., with reference to deliveries and pickups.

The motion will be granted.

This _____ 17th _____ day of April, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE